NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

---

MICHAEL M., SR., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.M., *Appellees.*

No. 1 CA-JV 15-0224
FILED 2-16-2016

---

Appeal from the Superior Court in Maricopa County
No. JD23937
The Honorable Bradley H. Astrowsky, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Kenton D. Jones and Judge Samuel A. Thumma joined.

**S W A N N**, Judge:

¶1        Michael M. ("Father") appeals the juvenile court's order severing his parental rights to his minor child, M.M. ("Child").  He disputes the court's finding that severance was in the best interests of Child and contends that the court was improperly influenced by his tattoo, in violation of his First Amendment rights.  For the following reasons, we affirm the juvenile court's severance order.

## FACTS AND PROCEDURAL HISTORY

¶2        Child was born substance-exposed to methamphetamine, amphetamine and THC on June 28, 2013.  The Arizona Department of Economic Security ("the Department")[1] removed Child, alleging that Child was dependent because of Father's history of substance abuse.  Child is an "Indian child" as defined under the Indian Child Welfare Act ("ICWA") because both parents are members of the Gila River Indian Community ("the Community").  *See* 25 U.S.C. § 1903(4).  The Community intervened in the action and provided an ICWA caseworker in addition to the Department caseworker.  The juvenile court found Child dependent as to both parents,[2] and the Department implemented concurrent case plans of family reunification and severance and adoption.  Because of Father's history of substance abuse and criminal behavior, the Department referred him for drug testing, substance-abuse treatment, and counseling to begin

---

[1]        Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety is substituted for the Arizona Department of Economic Security in this matter.  *See* ARCAP 27. For convenience, in the text of our decision we refer to both the Department of Child Safety and the Arizona Department of Economic Security as "the Department."

[2]        Child's biological mother also had her parental rights severed in the same order as Father.  She did not contest the severance, and she is not a party to this appeal.

when he became sober, but he did not participate in any services and sporadically visited Child.

¶3        In October 2013, Father assaulted a family member with a machete. He pled guilty to aggravated assault and was sentenced to five years in prison. While in prison, Father married a woman ("Stepmother") with whom he had been living before Child was born. Though Stepmother brought Child to visit Father in prison, his visitation privileges were suspended for several months because of disciplinary infractions during his incarceration. In June 2014, over Father's objection, the court changed the case plan to severance and adoption. The Department then filed a motion for severance in July 2014, alleging that Father's civil liberties had been suspended as a result of a felony conviction and his incarceration for a period of years would deprive Child of a normal home, pursuant to A.R.S. § 8-533(B)(4). Father contested the motion to sever parental rights.

¶4        Initially, Child had been placed with a maternal relative, but after concerns arose regarding that placement, he was placed with Stepmother as a temporary placement in January 2015. The caseworkers reported that Child appeared "happy and comfortable" in his placement with Stepmother and was "doing extremely well." Because of her marriage to Father, a member of the Community, Stepmother was an ICWA-compliant placement. If Father lost his parental rights, however, Stepmother would no longer be an ICWA-compliant placement.

¶5        During the severance hearing, the Department caseworker testified that Father had not participated in services. He opined that 4.5 to 5 years of incarceration was a significant time to be deprived of a parent and a normal home. He also testified that Child was adoptable and the Community had already identified an ICWA-compliant potential adoptive placement. The Community caseworker testified that the services provided fulfilled the ICWA requirements, and Child would suffer serious emotional or physical damage if he remained with Father.[3] While caseworkers from both the Department and the Community acknowledged that Stepmother had provided excellent care for Child, they expressed concern that

---

[3]      When an Indian child is involved, the ICWA requires the court make two additional findings: (1) that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," 25 U.S.C. § 1912(d), and (2) that, beyond a reasonable doubt, "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child," 25 U.S.C. § 1912(f). *See Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 333, ¶ 3 (2009).

Stepmother would allow Father to return to the home without making behavioral changes.

¶6 Though incarcerated, Father attended the severance hearing. At the hearing, the court mentioned a tattoo on Father's neck, which read "fuck you officer," and asked Father if he believed it set a good example for his son. The findings of fact in the severance order stated that "Father has a tattoo on his neck that reads: 'FUCK YOU OFFICER,'" though that fact was not used to support any conclusions of law in the order. The court additionally found that Father did not have a relationship with Child before incarceration; it would be difficult for Father in prison to create a relationship with Child; and Child would be in kindergarten before Father would be out of prison, a significant amount of time without Father at home.

¶7 The court concluded that the Department had proved the statutory ground for termination by clear and convincing evidence and the ICWA requirements beyond a reasonable doubt. Based on the testimony that there was an ICWA placement ready to adopt, Child was adoptable, and a continuing relationship with Father would be harmful, the court found by a preponderance of evidence that severance was in the best interests of Child and ordered Father's parental rights severed.

**DISCUSSION**

¶8 Father contends that the court erred in finding that severance was in the best interests of Child because the Department did not present sufficient evidence to justify the finding. He also asserts that the court impermissibly considered the text of his neck tattoo in making its decision, in violation of his First Amendment rights.

I.    THE JUVENILE COURT PROPERLY CONCLUDED THAT SEVERANCE WAS IN THE BEST INTERESTS OF CHILD.

¶9 In reviewing a severance order, we accept the court's findings of fact unless they are not supported by any reasonable evidence, and we will affirm unless the order is clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). To sever parental rights, the court must find clear and convincing evidence of at least one statutory ground for severance, and that a preponderance of the evidence shows that severance is in the best interests of the child. A.R.S. § 8-533(B); *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005). The best-interests determination must explain "how the [children] would benefit from a severance *or* be harmed by the continuation of the relationship."

*Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010) (citation omitted). The court may consider factors such as whether an adoptive placement is immediately available. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998). However, the juvenile court does not "weigh alternative placement possibilities to determine which might be better." *Id.*

**¶10** The caseworkers from the Department and the Community presented sufficient evidence for the court to conclude that severance was in the best interests of Child. Both testified that the Community had identified another relative in the Community who would be willing to adopt Child, demonstrating that severance would benefit Child. Both also testified that Child would be harmed if he remained with Father because of his substance abuse, criminal activities and unwillingness to participate in services to address those problems.

**¶11** Though Stepmother did meet the needs of Child, she only qualified as an ICWA-compliant placement because of her marriage to Father; if Father's rights were terminated, Stepmother would no longer be compliant. As the court pointed out, Stepmother's fitness as a temporary placement had no relevance to the best-interests finding.[4] Additionally, the testimony from Stepmother indicates that she does not believe Father committed aggravated assault, and she denies his history of drug use. She testified she would allow Father to move back in with her and Child when he is released. The court's concern about Stepmother's "blind spot when it came to Father, his criminal history and his drug use history" was warranted. Taken as a whole, these facts were sufficient to permit the court to conclude that a continuing relationship would harm Child. The record adequately supports the court's determination that severance was in the best interests of Child, and the court did not abuse its discretion.

II. THE JUVENILE COURT'S FINDING CONCERNING FATHER'S TATTOO DID NOT VIOLATE FATHER'S FIRST AMENDMENT RIGHTS.

**¶12** We find nothing on the record that impermissibly interfered with Father's First Amendment rights. The court did make a finding of fact regarding Father's tattoo in the severance order, and its questions to Father implied the court believed that the tattoo did not set a good example for Child. But the court did not tell Father he could not express himself through

---

[4] Although the court requested briefings on legal authority allowing consideration of the placement with Stepmother in the best-interests findings, the record does not include any such briefing.

the tattoo, that the tattoo was impermissible, or that he would be punished for having it. The tattoo was simply another statement by Father, and the court had the ability to take all of his statements made during the course of the severance hearing into consideration in its conclusions.

¶13　　　Second, contrary to Father's assertion, the court's mention of his tattoo was not "governmental persecution . . . for engaging in free speech." The court did not tie the tattoo to the conclusion that severance was in the best interests of Child. The conclusions of law do not mention the tattoo, and the tattoo does not appear as a factor in the court's decision that severance was in the best interests of Child. To the contrary, the court's conclusion focused on Father's relationship with Child, his criminal history, his substance abuse, and Stepmother's "blind spot" concerning Father's history. The presence or absence of the tattoo would not have altered the outcome because the relevant evidence in the record supports the court's findings.

## CONCLUSION

¶14　　　For the foregoing reasons, we affirm the severance of Father's parental rights to Child.



Ruth A. Willingham · Clerk of the Court
FILED: ama